Filed 3/26/15  In re N.L. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re N.L., a Person Coming Under the Juvenile Court Law. | B257197 (Los Angeles County Super. Ct. No. DK02727) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. N.L., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of the County of Los Angeles, Marguerite D. Downing, Judge.  Affirmed.

Ernesto Paz Rey, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

# INTRODUCTION

Na.L. (mother) appeals from the juvenile court's jurisdiction and disposition orders finding her minor daughter, N.L., born in October 2007, a dependent child of the juvenile court pursuant to Welfare and Institutions Code section 300, subdivision (b).[1] Mother contends that there was not substantial evidence to support the juvenile court's jurisdictional findings, arguing that her repeated false accusations that K.E., N.L.'s father,[2] sexually abused N.L., and mother's marijuana abuse, did not put N.L. at substantial risk of physical harm. We affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

N.L. and her family has been the subject of several previous child welfare referrals, all of which were determined to be inconclusive or unfounded. In at least three of the prior referrals it was alleged, inter alia, that father sexually abused N.L. In at least two of those referrals mother made the referral, and regarding at least two of the referrals N.L. underwent a medical examination. Plaintiff and respondent Department of Children and Family Services (Department) reported that one of the doctors who conducted a medical examination of N.L. and found that there were no signs of sexual or physical abuse had taken place, said "there has been prior reports that father had sexually abuse[d] the child which were determined to be untrue at the time." The Department reported, "Mother has been linked to prior sexual abuse referrals that have been called in on father. Mother has shown a pattern of reporting the allegations on father due to them not having a successful relationship and father moving on in another relationship." According to the Department, mother and father are legally divorced, and sole legal and physical custody of N.L. was granted to mother.

---

[1] All statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

[2] Father is not a party to the appeal.

On December 3, 2013, the Department received a referral alleging that N.L. disclosed father sexually abused her, and that mother had interfered with N.L.'s forensic interview. The Department's December 18, 2013, detention report stated that Sandy Himmelrich conducted a forensic interview on N.L. Himmelrich's report regarding the forensic interview stated that Himmelrich initially met with mother who said father has court-ordered alternate weekend visits with N.L., and that "when [N.L.] returns from visits with her father, [mother] asks [N.L.] if her father has touched her." Mother said that she has seen father touching N.L. over clothing "such as holding her with his hand on her crotch area instead of sitting [N.L.] on his arm." Mother stated that "she has had multiple conversations with [N.L.] reminding [N.L.] that [father's] is not to touch [her] on her butt or genitals . . . ." The forensic interview report further stated, "[Mother] added that she has had suspicions of [father] touching [N.L.] in the past since the age of 2. Per [mother] she has made 4-5 reports against [father] for sexual abuse which have all [been determined to be] 'unfounded' because mother did not want [N.L.] to have an exam that would 'hurt he[r]' . . . ." The morning of the forensic interview, mother again asked N.L. whether father touched her, and N.L. responded in the affirmative.

The forensic interview report stated that N.L. initially told Himmelrich that father touched her with his hands on her "butt" and "privates" over her clothing. After Himmelrich terminated the interview, mother asked her if N.L. disclosed that father digitally penetrated her. Himmelrich noted that N.L. only disclosed father touching her over her clothing. Mother asked Himmelrich to ask N.L. directly about father digitally penetrating her. Himmelrich explained, however, that she could not do so because it would be a leading question. Himmelrich agreed to speak further with N.L. to ask her what she and mother had discussed that morning. Himmelrich advised mother not to talk to N.L., and left mother alone with the child for a few moments. When Himmelrich returned and resumed her interview, N.L. told her that father had digitally penetrated her anus, and digitally penetrated her vagina 50 or 60 times. When Himmelrich asked the child why she had not disclosed this earlier, N.L. responded, "[M]y mom reminded me."

3

The Department's December 18, 2013, detention report stated that on December 2, 2013, Inglewood Police Department Officer Fredrick Osorio responded to a report from Children's Hospital in Los Angeles regarding a sexual assault report concerning then six-year-old N.L. When Officer Osorio arrived at Children's Hospital, mother told him that she and father were married for three years, had been separated since she became pregnant with N.L., and had joint custody of N.L. Mother also said that N.L. had just returned from visiting with father, and when she was driving N.L. to school that day, mother asked N.L. if father "had touched her inappropriate to her private parts," because, according to mother, father had apparently done that in the past. According to the detention report, "[N.L.] told her that [father] touched her buttocks and private area and inside." Mother said she then drove N.L. to the Children's Hospital, and when they arrived there, N.L. told her that father put one finger into her vagina.

Officer Osorio also interviewed N.L. N.L. told Officer Osorio that while she was sitting on the couch at father's house on an unknown date, father touched her "[b]utt and her private [area]" while she was clothed; and father had touched her buttocks in the past while she was clothed. N.L. said father has "[n]ever" put his finger "inside her private part" and has "[n]ever got[ten] naked" in front of her.

Officer Osorio's Police Department's Information Report documented that N.L. did not have any visible injuries and that the medical doctor who treated the child at Children's Hospital did not detect any signs of trauma to her "private areas." Officer Osorio stated in the report, "It should be known that [mother] has filed approximately four claims with [Department] for sexual assault on [N.L.] and [father] being the suspect. It should also be known that all cases filed with the [Department] had come back unfounded or inconclusive. [Mother] had filed claims dating back to 2010 against [father]. [Mother] said that when it came time to have [N.L.] checked with a [Sexual Assault Response Team nurse] she always backed out because she did not want the victim to go through the pain."

The Department's December 18, 2013, detention report stated that an Inglewood Police Department detective informed the Children's Social Worker (CSW) that there

4

would not be a criminal investigation because "mother tainted the investigation" by prompting N.L. to tell the investigator that father digitally penetrated her vagina and anus. Himmelrich also told a CSW that her interview with N.L. was "tainted" because "mother prompted the child to tell" her that father penetrated her vagina and anus with his finger.

N.L. told the CSW that she likes going to father's house, and no one has ever touched her "private parts," her "butt," or her breast area. N.L. admitted having told police and hospital staff that father digitally penetrated her vagina and anus, but stated: "I said that, but it was a lie." N.L. said, "my daddy touch my bottom when I boo boo. He makes sure it's clean and he wipes it." N.L. also stated that father and her aunt gives her baths when she was at father's house, that she uses the soap and towel on her body, and father helps her out of the bathtub and "helps me dry off."

The CSW inquired of N.L. whether the parents used drugs or alcohol. When the CSW asked N.L. if mother smoked, the child became withdrawn and fearful, her body language changed dramatically, and she said, "I don't want to tell you." After the CSW assured N.L. it was safe to speak with her, the child said not to tell mother but that mother smoked. N.L. said that she did not know what it is that mother smoked, but that it's "green and brown." N.L. said that mother "smokes outside, but I can still smell it. It stinks."

Father told the CSW that mother made false allegations against him on a yearly basis, and denied he sexually abused N.L. The Department reported that mother is a "Celebrity Hair Stylist." According to father, mother had affiliations with the Black Mafia Family, which the Department reported is "a criminal organization dedicated primarily to drug-trafficking" with connections to "hip-hop music and [the] entertainment world."

Mother said she had witnessed father inappropriately touch N.L. on two occasions. Mother said that when N.L. was a few months old, father put his face near the child's vagina and said he was smelling the area to see if she was clean. The CSW noted that this allegation was previously investigated and determined to be unfounded. Mother also

said she recently observed father holding N.L. on his hip while N.L. had her pants on, with his hand "cupped" on her buttocks.

N.L.'s paternal grandmother stated that mother "is a habitual liar." She also said that on several occasions N.L. has come home "smelling like marijuana," and on one occasion N.L. put a crayon in her mouth and said, "I'm smoking weed like mommy." Mother admitted to using marijuana, said she smoked it occasionally socially, did not smoke it around N.L., refused to drug test, and said that she would never drug test for the Department.

On December 13, 2013, the juvenile court removed N.L. from mother's care. N.L. was in the care of father. When the CSW monitored a visit between mother and N.L., mother again said that she would never drug test, and that the CSW took N.L. from mother and "gave her to the enemy."

Mother told the Department that her smoking marijuana did not have anything to do with N.L. Mother also stated "I don't appreciate how my daughter made me look like a liar. I only reported what she told me. I really don't think he (father) put his finger in her, but he does hold her inappropriately." Mother said that she called the paternal grandmother and apologized for making false allegations against father but said she did not know what to do.

On December 18, 2013, the Department filed a section 300 petition alleging N.L. was at risk due to mother's drug use and mother repeatedly falsely alleging father sexually abused N.L. The Department further alleged that father physically abused N.L., and mother and father had a history of engaging in violent altercations in N.L.'s presence. The juvenile court detained N.L. from mother and released her to father.

On February 14, 2014, the Department reported that N.L. said, "My mom smokes weed. It is like brown and it smells when I go outside. I smell a lot of smoke, but she doesn't let me see it. I found the cigarettes and smokes. I see them in the car."

Father denied that he sexually abused N.L. and told the Department, "When [mother] does not get her own way [with me], then the following week, she is making

6

allegations of me sexually abusing my child." He also said that mother smoked marijuana when they resided together.

At the May 28, 2014, adjudication hearing, mother testified regarding the incident of father's sexual abuse of N.L. that is the subject of this appeal. Mother said when she picked up N.L. from an approximately week-long visit with father, she asked N.L. if father was still "picking her up the way he was and that makes her feel uncomfortable." N.L. responded "yes" and said that father was putting his finger in her "butt." Mother had previously seen father pick up N.L. "from her crotch area," and mother told N.L. and father that it was not appropriate for father to do so. Mother denied using marijuana.

The juvenile court sustained counts b-3 and b-4, the counts regarding mother's drug use and history of making false allegations of sexual abuse against father. The sustained petition allegations stated, "b-3 [¶] The child [N.L.]'s mother has a history of illicit drug use and is a current abuser of marijuana which renders the mother incapable of providing the child with regular care and supervision. On prior occasions in 2013, the mother possessed marijuana, smoked near the child where the child could smell the marijuana and was under the influence of marijuana while the child was in the mother's care and supervision. The mother's substance abuse endangers the child's physical health and safety, placing the child at risk of physical harm, damage and danger. [¶] b-4 [¶] The child [N.L.]'s mother created an endangering and detrimental home environment for the child in that the mother has repeatedly made false allegations to law enforcement and medical personnel that the father sexually abused the child. Such an endangering and detrimental home environment established for the child, by the mother endangers the child's physical health and safety, placing the child at risk of physical harm, damage and danger." The juvenile court declared N.L. a dependent of the juvenile court, removed her from mother's custody, and ordered the child home-of-parent father.

**DISCUSSION**

**A. Standard of Review**

We review the juvenile court's jurisdiction findings for substantial evidence. (*In re Quentin H.* (2014) 230 Cal.App.4th 608, 613.) "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court. [Citation.]" (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) "We do not reweigh the evidence or exercise independent judgment . . . . '"[The] [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find [that the order is appropriate].'" [Citation.]" (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.)

**B. Applicable Law**

Section 300, subdivision (b) provides in pertinent part: "Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: [¶] . . . [¶] (b)(1) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . ."

"A jurisdictional finding under section 300, subdivision (b) requires '(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the minor, or a "substantial risk" of such harm or illness.' [Citation.] 'Subdivision (b) means what it says. Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the

8

child is exposed to a *substantial* risk of *serious physical* harm or illness.' [Citations.]" (*In re John M.* (2013) 217 Cal.App.4th 410, 418.)

### C. Analysis

#### 1. *False Sexual Abuse Allegations*

Mother does not deny or challenge the juvenile court's findings that she repeatedly made false allegations that father sexual abused N.L. Mother instead argues that her false allegations of father's sexual abuse of N.L. did not put N.L. at risk of suffering physical harm. We disagree.

There is evidence that mother made numerous false accusations that father sexually abused N.L., usually following disputes mother had with father. In doing so, mother subjected her young daughter to multiple interviews, investigations, and medical examinations regarding the alleged sexual abuse. Mother's claims of sexual abuse placed N.L. at risk of being subjected to more intrusive medical examinations that mother, in the past, declined to have N.L. subjected to because they were painful. It could be reasonably inferred that mother put her needs before N.L.'s interests by making false allegations of sexual abuse when involved in a dispute with father. Moreover, mother's conduct suggests the extent to which she will go in connection with her toxic relationship with father, whom she referred to as "the enemy." One cannot predict how far mother might go to harm the child's relationship with father. There is evidence that mother induced N.L. to be untruthful with the authorities. This could conceivably have an adverse affect on N.L. in future situations. All of this conduct also reflected inadequate supervision of N.L., and put N.L. at substantial risk of physical harm.

"[S]ection 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction. The subdivisions at issue here [including subdivision (b)] require only a 'substantial risk' that the child will be abused or neglected. The legislatively declared purpose of these provisions 'is to provide maximum safety and protection for children who are currently being physically, sexually,

9

or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm*.' (§ 300.2, italics added.) 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' (*In re R.V.* (2012) 208 Cal.App.4th 837, 843 [145 Cal.Rptr.3d 772].)" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

The evidence of mother's false allegations of father's sexual abuse of N.L. is substantial evidence supporting the conclusion that there is a substantial risk of exposure of N.L. to serious physical harm. Thus, under the standard of review that we are bound to follow, the evidence is sufficient to support the juvenile court's jurisdictional findings under section 300, subdivision (b).

### 2. *Marijuana Abuse*

Because we conclude that there is sufficient evidence to support the juvenile court's jurisdictional findings under section 300, subdivision (b) based on mother's false allegations of father's sexual abuse of N.L., placing N.L. at risk of suffering physical harm, we do not reach mother's contention that there was not substantial evidence to support the juvenile court's jurisdictional findings that N.L. was at risk of suffering physical harm based on mother's marijuana abuse. The Supreme Court has stated, "'"When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.]" (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)

Even if we were to reach the merits of mother's claim, there is substantial evidence supporting the juvenile court's jurisdictional findings under section 300, subdivision (b) based on mother's marijuana use. Mother does not deny or challenge the

10

juvenile court's findings that she used marijuana.  She argues only that it did not put N.L. at risk of suffering physical harm.

There is evidence that N.L., in the context of stating her mother "smokes weed," said that she had seen "cigarettes and smokes" in the car and had smelled marijuana.  In addition, N.L. emitted a marijuana odor.  N.L. therefore was put at substantial risk of serious harm by mother placing the marijuana such that it was accessible to N.L.  N.L. was exposed to ingesting the substance and the second hand smoke.  (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 825 [A parent places the minor child at a substantial risk of serious physical harm by keeping illegal drugs in a place accessible to the child, which drugs therefore could be ingested by the child].)  In addition, because N.L. was six years old at the time of the jurisdiction hearing, she was a child of "tender years" and therefore a "'finding of substance abuse is prima facie evidence of the inability of a parent . . . to provide regular care resulting in a substantial risk of harm' [citations]."  (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1219.)

**DISPOSITION**

The juvenile court's orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


MOSK, J.


We concur:


TURNER, P. J.


GOODMAN, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.